# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-995V
Filed: July 25, 2022
PUBLISHED

|  |  |
|---|---|
| CHERI LANG,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Special Master Horner<br><br>Ruling on Damages; Shoulder Injury Related to Vaccine Administration ("SIRVA"); Influenza ("Flu") vaccine |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.*
*Colleen Clemons Hartley, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON DAMAGES[1]

On July 24, 2017, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10,[2] et seq., ("the Vaccine Act"). (ECF No. 1.) Petitioner alleged that she suffered from a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine she received on October 11, 2016. (*Id.*) On December 11, 2020, I issued a decision finding that petitioner was entitled to compensation for her SIRVA. (ECF No. 87.) The parties were unable to informally resolve the issue of damages leading petitioner to file a motion for a ruling on the record for damages on November 22, 2021. (ECF No. 109.) Respondent filed his response to the motion on February 7, 2022, and petitioner filed her reply on February 22, 2022. (ECF Nos. 111, 112.) Petitioner's motion is now ripe for a ruling on the record.

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] All references to "§ 300aa" below refer to the relevant section of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

1

I.   **Relevant Medical History**

   a.  **As Reflected in the Medical Records**

Prior to the vaccination at issue, petitioner was a relatively healthy 45-year old woman with no significant medical history.  She was capable of lifting over fifty pounds and had received the flu vaccine for years without issue.  (Ex. 2, p. 6.)  On October 11, 2016, petitioner received a flu vaccine at her place of employment, Dawn Food Products.  (Ex. 1, p. 1.)

About two and a half months later, petitioner presented to Dr. Rebecca Kelley at SSM Family Healthcare ("SSM") on December 28, 2016.  (Ex. 2, p. 5.)  Petitioner's chief complaint was "pain in her right deltoid."  (*Id.*)  She reported that she had experienced this pain "since receiving flu shot on 10-11-16" and that her "pain is worse if [she] raises the arm."  (*Id.*)  Petitioner described her pain as gradually worsening, dull, and constant.  (*Id.* at 6.)  Petitioner reported that her pain was 2/10 while resting, and 6/10 when raising her arm.  (*Id.*)  Dr. Kelley's exam revealed decreased abduction, flexion, extension, internal rotation, and external rotation in petitioner's right shoulder.  (Ex. 2, p. 8.)  Although petitioner reported pain in her right shoulder, her muscle strength was only somewhat diminished, showing 4/5 strength in her flexion, extension, adduction, abduction, external rotation, and internal rotation, and 5/5 strength in her scapula elevation, retraction, and protraction.  (*Id.*)  Follow up MRI on January 12, 2017 revealed a mild interstitial tear and small subchondral cyst in the humeral head, but nothing remarkable in her AC joint.  (Ex. 4, p. 19.)

On January 19, 2017, petitioner was evaluated for physical therapy at Peak Sport and Spine.  (Ex. 3, p. 7.)  She described her pain as 2/10 at best and 7/10 at worst.  (*Id.* at 7, 8.)  Petitioner was scheduled for four weeks of physical therapy with two sessions per week.  (*Id.* at 9.)  By January 24, 2017, petitioner indicated that she was improving, and by February 14, she was tolerating her physical therapy without pain or difficulty.  (*Id.* at 11, 28.)

Petitioner received an orthopedic evaluation at SSM from Nurse Practitioner ("NP") Carrie Lucas and Dr. Richard White on February 21, 2017.  (Ex. 6, p. 1.)  During this evaluation, petitioner reported that her physical therapy had "helped a little," but that she still experienced daily pain, specifically when lifting.  (*Id.*)  Petitioner's exam revealed tenderness to palpation over her lateral shoulder with a "deep pain," mild tenderness of the AC joint and biceps tendon, full active range of motion, pain with abduction, normal strength, and a positive impingement test.  (*Id.* at 2.)  Reviewing petitioner's MRI, NP Lucas noted a subtle abnormality in the supraspinatus consistent with tendinopathy and in the humeral head consistent with impingement.  (*Id.*)  Petitioner was diagnosed with rotator cuff impingement syndrome and received a steroid injection in her subacromial space.  (*Id.* at 3.)

Petitioner was again seen by NP Lucas on April 4, 2017.  (Ex. 6, p. 10.)  During this visit petitioner reported that the steroid injection she received during her previous visit reduced her pain for approximately two weeks, but that it had since returned.  (*Id.*)  Petitioner reported that she had pain even at rest, but no pain past her elbow, no numbness, and occasional neck stiffness related to the way she postured her shoulder to account for her pain.  (*Id.*)  Petitioner showed full range of motion and did not appear to have tenderness to palpation at the AC joint but did show tenderness in the bicipital groove.  (*Id.*)  NP Lucas noted that physical therapy, home exercises, and subacromial steroid injections all failed to resolve petitioner's pain and scheduled an MRI arthrogram to evaluate for a labral pathology.  (*Id.* at 11.)

Petitioner received an MRI arthrogram on April 14, 2017, which showed no rotator cuff tears, mild increased signal in the supraspinatus consistent with tendinosis, minimal fluid in the subacromial and subdeltoid bursa, mild deformity of the superior labrum, and a small subchondral cyst near the supraspinatus insertion.  (Ex. 4, p. 42.)  It was noted that it was uncertain whether petitioner's mild labrum deformity was due to a "normal variation" or labral injury.  (*Id.*)

Petitioner returned to Peak Sport and Spine for her final appointment on April 14, 2017.  (Ex. 3, p. 33.)  During this visit, petitioner reported that her pain had decreased to a 2/10 at worst, and that she was able to perform daily activities and work activities with little or no pain.  Petitioner's discharge assessment noted that she exhibited "an excellent prognosis at time of discharge from skilled rehabilitative therapy in conjunction with a home exercise program."  (*Id.*)

Petitioner was seen on April 27, 2017 by orthopedic surgeon Dr. Tameem Yehyawi of Columbia Orthopedic Group.  (Ex. 5, p. 7.)  She explained to Dr. Yehyawi the medical treatment she had received up to that point and indicated that she did not believe the steroids or physical therapy had worked due to the fact that her pain persisted.  (*Id.*)  Petitioner described her pain as a "constant dull ache that feels deep within the joint."  (*Id.*)  Dr. Yehyawi noted some localization of petitioner's pain over the lateral aspect of her shoulder that worsened with overhead activity and external rotation.  (*Id.*)  Petitioner denied any weakness, stiffness, numbness, or paresthesia.  (*Id.*)  During this exam, petitioner described her pain as 4/10 and characterized the sensation as aching and shooting.  (Ex. 5, p. 7-8.)  Dr. Yehyawi noted that petitioner had "an excellent range of motion" but showed painful Hawkins and Neer impingement tests.  (*Id.* at 8.)  Dr. Yehyawi believed that the majority of petitioner's pain was coming from her rotator cuff and bursitis that was "triggered by a flu shot with inflammation there."  (*Id.* at 9.)  Dr. Yehyawi believed that, due to the failure of other conservative treatments, surgery was the best option for petitioner.  (*Id.*)  Petitioner received arthroscopic shoulder surgery including rotator cuff debridement, subacromial decompression with acromioplasty, labrum debridement, and a bursectomy on June 19, 2017.  (Ex. 7, pp. 1, 4.)

Following her surgery, petitioner began a new round of physical therapy on July 5, 2017 with therapist Calvin Canine at Peak Sport and Spine.  (Ex. 28, p. 5.)  On July

25, 2017, petitioner was again seen by Dr. Yehyawi, and reported that physical therapy had mildly improved her range of motion, but that her lateral shoulder discomfort persisted.  (Ex. 11, p. 1.)  Dr. Yehyawi believed that this would resolve with time.  (*Id.*)  Petitioner completed her post-operation physical therapy on August 30, 2017.  (Ex. 28, p. 53.)  Petitioner's final physical therapy record notes that she was able to tolerate all exercises with mild pain and recommended continued home exercise.  (*Id.* at 51.)

Petitioner saw Dr. Yehyawi for several post-surgery follow-up exams between September and December of 2017.  (Ex. 13, p. 1, 2-3, 4-5, 6-8.)  On September 5, Dr. Yehyawi observed that petitioner only felt pain at the extremes of flexion and abduction but was otherwise pain free.  (*Id.* at 1.)  On October 17, petitioner reported that her pain was improving and that she was making progress, but still experienced some pain with certain movements.  (*Id.* at 2.)  Dr. Yehyawi administered a cortisone injection into petitioner's subacromial space without complication.  (*Id.* at 3.)  On November 21, petitioner indicated that the October 17 cortisone injection provided temporary relief but that her pain returned within a week.  (*Id.* at 4.)  Dr. Yehyawi noted that petitioner experienced some pain as a result of her rotator cuff tendinopathy but believed that the primary pain she complained of was coming from the AC joint.  (*Id.* at 5-6.)

Petitioner's final post-surgery follow-up with Dr. Yehyawi was on December 28, 2017.  (Ex. 13, p. 6-8.)  During this visit, Dr. Yehyawi reported that petitioner had "developed symptoms over the [AC] joint that were not necessarily present prior to her first surgery. Her pain is localized there."  (*Id.* at 7.)  Further, Dr. Yehyawi noted that petitioner's AC joint injection alleviated her pain for around nine days, but that it had returned.  (*Id.*)  Dr. Yehyawi again felt that the best course of action was surgery, and petitioner agreed.  (*Id.* at 8.)

Petitioner underwent a right shoulder arthroscopy with distal right clavicle resection on January 29, 2018 to treat "right shoulder [AC] joint arthritis."  (Ex. 14, p. 1.)  On March 13, 2018, Dr. Yehyawi indicated that petitioner had no pain at rest, but that she may continue to experience occasional soreness due to her mild rotator cuff tendinopathy.  (Ex. 15, p. 3.)  On April 24, 2018, petitioner indicated that she was "much better than before surgery."  (Ex. 20, p. 1.)

Petitioner returned to Dr. Yehyawi on August 2, 2018, complaining of continued discomfort in her anterolateral shoulder and AC joint.  (Ex. 22, p. 1.)  Dr. Yehyawi believed that petitioner was suffering from an AC arthritis flare up and planned for an ultrasound guided steroid injection.  (*Id.*)  Petitioner's physical examination revealed decreased range of motion, 130 degrees flexion, and minimal discomfort with Hawkins and Neer testing.  (*Id.* at 2.)  Dr. Yehyawi concluded that petitioner now presented "with some inflammation potentially from some scar tissue in the [AC] joint with some crepitus and discomfort there as well as rotator cuff tendinopathy."  (*Id.* at 2.)

By August 30, 2018, Dr. Yehyawi could no longer explain petitioner's discomfort.  (Ex. 26, pp. 1-2.)  Instead, he ordered anti-inflammatories and an MRI.  (*Id.*)  Several days later, on September 5, 2018, Dr. Yehyawi noted that petitioner still had an

insertional cyst in her infraspinatus. (*Id.* at 3.) He also believed that petitioner's "primary pain generator" was persistent rotator cuff tendinopathy and some bursitis that had reformed. (*Id.*) Dr. Yehyawi's conclusion notes that petitioner had suffered "months and months of significant pain and inflammation as she had a flu shot which set off an inflammatory storm throughout her rotator cuff and significant pain that persisted for several months." (*Id.*) Dr. Yehyawi recommended physical therapy, an MRI, and a course of anti-inflammatories to manage petitioner's pain. (*Id.* at 2.)

Petitioner began another round of physical therapy on September 12, 2018 at Peak Sport and Spine. (Ex. 27, p. 75.) Although the physical therapist indicated January 29, 2018 as the date of onset for petitioner's pain, they also noted "a long history of initial onset [from] 10-11-16 after a flu shot in the right shoulder. . . .'" (*Id.*) Petitioner's physical therapist noted "popping, crunching with elevation" and some right shoulder weakness. (*Id.* at 76-77.)

On December 3, 2018, petitioner was examined by orthopedist Dr. Christopher Farmer. (Ex. 26, p. 9.) Petitioner's exam revealed a mildly flared AC joint and mild rotator cuff tendinopathy. (*Id.*) He discussed potential treatment options including oral and injectable medications, therapy, additional imaging, and surgery. (*Id.* at 10.) Petitioner chose to receive an injection of Autologous Conditioned Plasma ("ACP") into her right shoulder. (*Id.*) Petitioner was seen again by Dr. Farmer on December 31, 2018. (*Id.* at 12.) At that time, Dr. Farmer believed petitioner was suffering from adhesive capsulitis based on her complaints of stiffness. (*Id.*) He prescribed an oral steroid and encouraged continued home exercise. (*Id.*)

Dr. Farmer followed up with petitioner one month later, on January 31, 2019. (Ex. 26, p. 14.) Petitioner reported that the oral steroid provided relief for her shoulder pain and that her symptoms had not worsened. (*Id.*) On April 16, 2019, Dr. Farmer noted that petitioner had almost full abduction and flexion with a "much better" range of motion in her right shoulder. (Ex. 29, p. 2.) Petitioner's internal rotation was mildly painful, but without weakness. (*Id.*) Dr. Farmer believed that petitioner was suffering from a mildly flared AC joint and mild rotator cuff tendinopathy. (*Id.*) He recommended a glenohumeral injection and home exercise. (*Id.*)

Dr. Farmer saw petitioner for the last time on June 13, 2019. (Ex. 29, p. 4.) During this visit, he indicated that the only option left to diagnose petitioner's shoulder pain was to check for underlying neurogenic causes. (*Id.*) Consequently, Dr. Farmer ordered a nerve conduction test which showed no abnormalities. (*Id.*) He concluded that petitioner was simply suffering from a chronic impingement syndrome in the AC joint and that "we may just have to consider her to be at maximal medical improvement." (*Id.*)

Following treatment from Dr. Farmer, petitioner sought another evaluation of her shoulder, this time from Dr. Matthew Smith. (Ex. 38, p. 1.) Petitioner rated her pain as a 3/10 at this visit and described it as a "deep aching." (*Id.*) She related a medical history of two shoulder surgeries, and pain following her flu shot. (*Id.*) Dr. Smith

5

observed good rotator cuff strength, but deltoid atrophy and mid-arm pain.  (*Id.* at 2.)  Dr. Smith ordered an MRI, which revealed mild infraspinatus and subscapularis tendinosis and mild glenohumeral osteoarthritis.  (*Id.* at 2, 4.)

Petitioner had an ultrasound-guided right suprascapular nerve block procedure on November 27, 2019.  (Ex. 38, p. 9.)  She was seen by Dr. Smith for a follow-up on December 23, 2019.  (*Id.* at 5.)   Petitioner reported that the nerve block did not help her pain at all.  (*Id.*)  Dr. Smith noted that petitioner's pain was "potentially the result of a post vaccine inflammatory neuropathy" and referred her to pain management for further evaluation.  (*Id.* at 6.)

A report from Dr. Ebby George Varghese dated January 13, 2020, indicates that it is unlikely petitioner will ever be pain free, prescribed Neurontin, a nerve-pain management drug, and noted that "her shoulder is not the same shoulder she had prior to her flu shot."  (Ex. 48, pp. 2-3.)  Petitioner continues to be symptomatic and treats her chronic shoulder pain with tramadol (a narcotic) under the care of a nurse practitioner at a pain management center. (Exs. 50, 53-54.)  As of May 11, 2021, the nurse practitioner reports that "[w]e have no further procedure options for her. We plan on continuing medication management with at least [a] visit every 6 months to manage her continued pain. We believe she will continue on her current medication regiment for the foreseeable future."  (Ex. 51.)

### b.  As Reflected in Affidavits and Declarations

In her first affidavit dated August 15, 2017, petitioner indicated that her flu shot was painful. (Ex. 10, p. 1.)  Anticipating that the pain would subside, petitioner prioritized care for her daughter and put off seeking care for her own pain.  (*Id.*)  However, by about Christmastime, petitioner felt her pain was "excruciating" and sought care.  (*Id.*) Petitioner indicated that she has "constant" pain that has prevented her from participating in her daughter's active lifestyle (citing bowling and spotting her during gymnastics). (*Id.*)  She also reported that the injury has affected her job as an inventory analyst, preventing her from lifting 30–50-pound bags and boxes and causing her typing responsibilities to be painful. (*Id.* at 1-2.)  Petitioner also described the effect her injury had on her wedding and honeymoon occurring during this period and the financial toll her injury has had due to her high deductible insurance plan.  (*Id.* at 2.)  In her supplemental affidavit, petitioner explained that as of December 29, 2019, her orthopedist had concluded she had no further treatment options and referred her to a pain management clinic in January of 2020.  (Ex. 52, p. 1.)

Additionally, several witness declarations were filed in this case.  (Exs. 31-33.)  These declarations focus on the fact that petitioner experienced immediate pain following her vaccination despite her more than two-month delay in seeking treatment.  They do not speak to the longer-term course of petitioner's condition.

## II.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  Section 15(a)(4).  Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary."  Section 15(a)(1)(B).  Finally, petitioners who have had their earning capacity adversely impacted due to their vaccine injury may receive "compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections."  Section 15(a)(3)(A).  The petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress.  *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  In general, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).  However, for SIRVA claims – cases involving competent adults suffering only orthopedic injuries – awareness of the injury is generally not considered a significant factor.  *See e.g. Lawson v. Sec'y of Health & Human Servs.*, No. 18-882V, 2021 WL 688560, at *4 (Fed. Cl. Spec. Mstr. Jan. 5, 2021); *Welch v. Sec'y of Health & Human Servs.*, No. 18-74V, 2021 WL 1795205, at *3 (Fed. Cl. Spec. Mstr. Apr. 5, 2021); *McDorman v. Sec'y of Health & Human Servs.*, No. 19-814V, 2021 WL 5504698, at *2 (Fed. Cl. Spec. Mstr. Oct. 18, 2021).

Special masters may also consider prior awards when determining what constitutes an appropriate award of damages.  *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (explaining that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, while potentially persuasive, decisions regarding prior awards are not binding.  *See Nance v. Sec'y of Health & Human* Servs., No. 06–730V,

2010 WL 3291896, at *8 (Fed. Cl. Spec. Mstr. July 30, 2010); *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand.").

### III.   Party Positions

####   a. Petitioner's Motion

Based largely on the explanation contained in her first affidavit, petitioner contends that she has been "profoundly" aware of her injury from the time of onset. (ECF No. 109, p. 13.)  Additionally, she stresses that the severity of her injury is evidenced by her "two surgeries, five steroid injections, multiple MRIs, and dozens of physical therapy sessions – none of which were successful in curing her pain." (*Id*.) Petitioner notes that as of the filing of her motion she has been enduring this pain and suffering for more than five years and with "little if any" hope of a full recovery.  (*Id*. at 13-14.)

Petitioner requests an award of $215,000.00 for actual pain and suffering and $2,500 per year for the remainder of petitioner's life reduced to the present net value for future pain and suffering.[3]  (*Id*. at 14.)  Petitioner argues that her requested award is reasonable in light of the facts of this case and consistent with prior SIRVA awards. Specifically, petitioner cites the following reasoned decisions as reflecting comparable facts: *Schoonover v. Sec'y of Health & Human Servs.*, No. 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) (awarding $200,000.00 in actual pain and suffering and $1,200.00 per year for future pain and suffering); *Lawson v. Sec'y of Health & Human Servs.*, No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (awarding $205,000.00 for pain and suffering); *Welch v. Sec'y of Health & Human Servs.*, No. 18-74V, 2021 WL 1795205 (Fed. Cl. Spec. Mstr. Apr. 5, 2021) (awarding $210,000.00 for pain and suffering); *McDorman v. Sec'y of Health & Human Servs.*, No. 19-814V, 2021 WL 5504698 (Fed. Cl. Spec. Mstr. Oct. 18, 2021) (awarding $200,000.00 for pain and suffering); and Elmakky v. Sec'y of Health & Human Servs., No. 17-2032V, 2021 WL 6285619 (Fed. Cl. Spec. Mstr. Dec. 3, 2021) (awarding $205,000.00 for pain and suffering).  Petitioner cites these prior awards primarily due to the fact of these petitioners having undergone multiple surgeries.[4]  (ECF No. 109, pp. 14-15.)  She contends that her case is the most severe and longest lasting as compared to these cited cases, warranting a higher award.  (*Id*. at 15.)

Petitioner also requests $4,209.59 for lost wages, and $4,847.18 for unreimbursed out-of-pocket expenses.  (*Id*. at 16.)

---

[3] Using her remaining life expectancy of 34.5 years.  (ECF No. 109, n. 2 (citing https://www.ssa.gov/cgi-bin/longevity.cgi (last visited November 22, 2021).)

[4] Petitioner also cited a prior stipulated settlement of $200,000.00.  (*Id*. at 15.)

8

### b. Respondent's Response

Respondent devotes a significant portion of his response to discussing the Vaccine Act's statutory $250,000.00 cap for noneconomic damages. Respondent notes that prior to 2013, special masters routinely reserved the statutory maximum damages for the most severely injured petitioners. (ECF No. 111, pp. 11-12.) Following the Court of Federal Claims decision in *Graves v. Secretary of Health and Human Services*, however, that approach was called into question. 109 Fed Cl. 579 (2013). In *Graves*, the Court rejected the prior approach as "artificially and arbitrarily" limiting damages and instead indicated that damages should be determined in the first instance without respect to the statutory cap. *Id*. at 589-90. Respondent "agrees with *Graves* to the extent it calls for an individualized assessment of damages based on the specific facts of petitioner's case. However, to the extent *Graves* is interpreted to endorse a methodology that would result in the vast majority of Vaccine Act claimants recovering the statutory maximum amount for pain and suffering, respondent disagrees, because that is clearly inconsistent with the legislative history." (ECF No. 111, pp. 12-13.)

With regard to this case, respondent stresses that "petitioner delayed seeking initial treatment. While she has participated in a variety of treatment modalities for her right shoulder injury, she maintains full time employment. She has experienced modest pain levels and has satisfactory range of motion in her right extremity. She has not returned to the orthopedist in two years." (ECF No. 111, p. 19.) Additionally, respondent contends that, even if petitioner's degenerative changes did not defeat her claim with respect to entitlement, they should be considered in assessing her damages. (*Id*. at 20.) Respondent argues that despite her reports of ongoing pain, petitioner exhibited full range of motion after only four months (citing Ex. 6, p. 1) and was able to perform her activities of daily life with little to no pain (citing Ex. 3, p. 33). (*Id*.) Respondent contends that, beginning in November of 2017, petitioner's pain was attributed to acromioclavicular ("AC") joint arthritis after her prior June 2017 arthroscopic surgery had largely resolved her pain, except for at the extremes of flexion and abduction. (*Id*. at 20-11 (citing Ex. 13, pp. 1, 4-5).) Respondent stresses that the second surgery was in treatment of the AC joint arthritis. (*Id*. at 20 (citing Ex. 14, p. 1).) By the time petitioner began treatment with the pain management center, she was "highly functional" and working full time. (*Id.* (citing Ex. 48).)

Respondent contends the prior SIRVA awards cited by petitioner are distinguishable. (*Id*. at 21-23.) Specifically, the *Schoonover* petitioner did not delay in seeking treatment, reported severe pain, had reduced range of motion, and had a 40% permanent partial disability. (*Id*. at 22 (citing *Schoonover*, 2020 WL 5351341, at *4-5).) The *Lawson* petitioner likewise did not delay in seeking treatment, underwent three surgeries, was fired from her job, and was unable to complete simple tasks such as outstretching her arms. (*Id*. at 22-23 (citing *Lawson*, 2021 WL 688560, at *1, 3, 5).) The *Welch* petitioner had a more extensive surgery, a reverse total shoulder replacement, was caring for her terminally ill husband while affected by her SIRVA and had to retire early due to pain and emotional distress. (*Id*. at 23 (citing *Welch*, 2021 WL 1795205, at *1-3).) The *McDorman* petitioner did not delay in seeking treatment, had a

greater number of steroid injections, and suffered bilateral shoulder pain due to overreliance on her unaffected arm. (*Id.* (citing *McDorman*, 2021 WL 5504698, at *3-4).) Like the *Lawson* petitioner, the *Elmakky* petitioner underwent three surgeries. (Id. (citing 2021 WL 6285619, at *6).) Respondent additionally notes that the *Lawson* petitioner suffered a SLAP tear which caused the chief special master to question whether all of her sequela were SIRVA-related. According to respondent, the same logic should apply in the instant case due to petitioner's AC arthritis. (*Id.* at n. 15 (citing *Lawson*, 2021 WL 688560, at *6).)

Despite distinguishing each of the cases cited by petitioner, respondent did not cite any other cases that he views as comparable. Respondent proposes that petitioner should be awarded $180,000.00 in actual pain and suffering. Respondent contends that petitioner should not be awarded any damages for future pain and suffering. And although Respondent argues that petitioner's lost wages claim is not adequately documented; he contends that, "[i]f the Court is inclined to make an award of damages for lost earnings based on the form of the evidence currently provided, respondent states that the appropriate amount for lost earnings is $3,059.11." (*Id.* at 24.) Respondent agrees that petitioner should be awarded $4,847.18 for unreimbursed out-of-pocket expenses. (*Id.* at n. 1.)

### c. Petitioner's Reply

Petitioner is critical of respondent's discussion of the prior *Graves* decision. Petitioner contends that *Graves* "while not specifically binding on the special masters, is legally correct and has become the law of the Program." (ECF No. 112, p. 2.)

Citing a prior onset ruling by the Chief Special Master, petitioner urges that she should not be penalized for her delay in seeking treatment. (*Id.* at 4-5 (citing *Wyffels v. Sec'y of Health & Human Servs.*, No. 18-1874, 2021 WL 798834, at *4 (Fed. Cl. Spec. Mstr. Jan. 26, 2021)).) Petitioner asserts that her affidavit explains why her delay in seeking treatment was reasonable. (*Id.*)

Petitioner suggests that respondent "tries to downplay" her pain and suffering by noting her full range of motion as of February 21, 2017. (*Id.* at 5.) Petitioner counters that administration of a steroid injection at that visit demonstrates her ongoing pain. (*Id.* (citing Ex. 6, p. 2).) Petitioner stresses that she had five steroid injections and a nerve block and further notes that petitioner reported to Dr. Yehyawi on April 27, 2017 that her first steroid injection provided relief for only two weeks. (*Id.* at n. 2, p. 6.) She contends that the need for surgery in June of 2017 shows the failure of conservative measures. (*Id.* at 6.)

Petitioner also disputes respondent's characterization of petitioner's condition from November 2017 onward. Whereas respondent focused on AC arthritis, petitioner contends that Dr. Yehyawi never eliminated petitioner's SIRVA as a cause of her continuing pain and that Dr. Varghese continued to attribute petitioner's pain to her prior

10

flu vaccine even after her second surgery.  (*Id*. at 6-7 (citing Ex. 13, p. 7; Ex. 14, p. 3; Ex. 48)).

Additionally, petitioner further elaborates in her reply why the prior cases she cited in her initial motion should be considered comparable despite respondent's competing interpretation.  (*Id*. at 7-8.)  Finally, petitioner asserts that "[t]o the best of petitioner's knowledge and research, with only one exception, the SPU has never awarded a petitioner who suffered more than one surgery less than $200,000.00 in past pain and suffering."  (*Id*. at 8.)  Petitioner acknowledges that the petitioner in *M.W. v. Secretary of Health & Human Services* was awarded $195,000.00 for actual pain and suffering but contends that the case is distinguishable due to a two-year gap in treatment.  (*Id*. at 8-9 (citing No. 18-267V, 2021 WL 3618177 (Fed. Cl. Spec. Mstr. Mar. 17, 2021)).)

## IV. Additional Background Regarding SIRVA Damages

The majority of SIRVA cases resolve within the Special Processing Unit or "SPU" which is overseen by the Chief Special Master.  In a recently published decision awarding damages, the Chief Special Master explained as of January of 2022 that 2,306 SIRVA cases had been compensated within the SPU since its inception in July of 2014.  *See Winkle v. Sec'y of Health & Human Servs*., No. 20-485V, 2022 WL 221643, at *3 (Fed. Cl. Spec. Mstr. Jan. 11, 2022).  Among those cases, 88 were awarded compensation based on a reasoned decision of the special master.  *Id*.  As explained above, petitioner has cited just six of these prior decisions while respondent has not cited any prior SIRVA awards.  Among the above-referenced 88 decisions, the Chief Special Master has explained that the awards for actual pain and suffering have ranged from $40,000.00 to $210,000.00, with a median award of $94,000.00.  Five prior cases awarded future pain and suffering, with yearly awards ranging from $250 to $1,500 per year.  *Id*.

Unsurprisingly, stipulated and proffered awards cover a much larger range – from $5,000 for the lowest stipulated amount to $1,845,047.00 for the highest proffered award.  *Winkle*, 2022 WL 221643, at *3.  Of course, these amounts are not limited to pain and suffering awards.  Moreover, as the Chief Special Master observed "even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision."  *Id*. (emphasis original).

While petitioner has cited most of the prior SIRVA awards that involved petitioners who had multiple surgeries, two additional decisions have been published subsequent to the briefing in this case.  *Meirndorf v. Secretary of Health & Human Servs*., No. 19-1876V, 2022 WL 1055475 (Fed. Cl. Spec. Mstr. Mar. 7, 2022) (awarding $200,000.00 for pain and suffering); *Lavigne v. Sec'y of Health & Human Servs*., No. 19-1298V, 2022 WL 2275853 (Fed. Cl. Spec. Mstr. May 12, 2022) (awarding $198,000.00 for pain and suffering).  These two cases remain consistent with petitioner's observation that the $195,000.00 award in *M.W.* is the lowest pain and

suffering award made to a petitioner who underwent multiple surgeries. (ECF No. 112, pp. 8-9.)

From among the available prior reasoned decisions, the closest award to the $180,000.00 proposed by respondent for this case is that of *Hooper v. Secretary of Health and Human Services*, in which the petitioner was awarded $185,000.00 for past pain and suffering along with an additional award for future pain and suffering. No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019). The *Hooper* petitioner underwent a single surgery but had a poor outcome, resulting in a 50% disability due to reduced range of motion. *Id.* at *9-10. To my knowledge, all of the remaining reasoned decisions awarded damages lower than what respondent agrees is appropriate in this case.

## V. Discussion

### a. Actual (Past) Pain and Suffering

Given that pain and suffering is inherently subjective, and given the number of variables involved in assessing each petitioner's medical history, direct comparison to other cases is very difficult. Nonetheless, petitioner is persuasive in suggesting that there is a relevant body of caselaw involving at least somewhat similarly situated petitioners, *i.e.*, petitioners suffering the same injury and having a course of treatment that includes multiple surgeries. Given that SIRVAs can and often do resolve without any surgery at all, it is clear that those cases involving multiple surgeries are distinguishable as representing a group of more seriously injured petitioners. As petitioner notes, reasoned decisions addressing these cases have awarded pain and suffering damages ranging from $195,000.00 to $210,000.00, clearly the upper end of reasoned SIRVA awards. In addition to providing some evidence of the severity of dysfunction underlying the petitioner's condition, surgeries are further traumas to the body that, although ultimately beneficial in the longer term, are associated with recovery periods that contribute additional pain and suffering in themselves.

Respondent, by contrast, seeks to distinguish each of the cases cited by petitioner based on varying factual distinctions. However, respondent's specific proposal seeking an award of $180,000.00 is more difficult to understand. Respondent contends that factually this case suggests a less severe injury than those presented in the prior cases relied upon by petitioner. However, respondent proposes an award in this case that is *higher* than what he proposed in any of those prior cases. *Schoonover*, 2020 WL 5351341, at *2 (noting respondent proposed an award of $165,000.00); *Lawson*, 2021 WL 688560, at *4 (noting respondent declined to propose an award); *Welch*, 2021 WL 1795205, at *4 (noting respondent proposed an award of $166,500.00); *McDorman*, 2021 WL 5504698, at *4 (noting respondent proposed an award between $135,000.00 and $160,000.00); *Elmakky*, 2021 WL 6285619, at *4 (noting respondent proposed an award of $155,000.00). Moreover, despite having the institutional knowledge of well over 2,000 prior SIRVA cases resolved (*see Winkle, supra*), respondent has not identified any other case as being similar. Additionally,

respondent's proposal is likely informed in part by his explicit argument that higher awards should be reserved for other types of more catastrophic injuries.  (ECF No. 111, p. 14.)  However, as discussed in *Graves*, that approach leads to arbitrary results.  109 Fed Cl. at 589-90.  Moreover, even though it is not binding, special masters have consistently followed *Graves* for close to a decade now.  *See, e.g., Issertell v. Sec'y of Health & Human Servs.*, No. 20-0099V, 2022 WL 2288247, at *2 (Fed. Cl. Spec. Mstr. May 17, 2022); *Desai v. Sec'y of Health & Human Servs.*, No. 14-811V, 2020 WL 8768069, at *7 (Fed. Cl. Spec. Mstr. Dec. 21, 2020); *Knudson v. Sec'y of Health & Human Servs.,* No. 17-1004V, 2018 WL 6293381, at *7 (Fed. Cl. Spec. Mstr. Nov. 7, 2018).

Respondent also brings forward several factual issues that he contends should bear on the appropriate pain and suffering award in this case.  These issues are petitioner's delay in seeking treatment, her largely intact range of motion, and the fact that her second surgery was at least in part attributable to arthritis.  I shall address each in turn.

Prior cases have noted that a delay in seeking treatment, even while not necessarily informative regarding onset and entitlement, may nonetheless still be relevant to assessing the severity of pain and suffering.  *See Marino v. Sec'y of Health & Human Servs.*, No. 16-622V, 2018 WL 2224736, at *8 (Fed. Cl. Spec. Mstr. Mar. 26, 2018); *Eshraghi v. Sec'y of Health & Human Servs.*, No. 19-39V, 2021 WL 2809590, at *3 (Fed. Cl. Spec. Mstr. June 4, 2021).  In this case, however, petitioner's delay in seeking treatment was less than three months, which is not unheard of among SIRVA cases, even those receiving above median awards.  *See e.g., Vaccaro v. Sec'y of Health & Human Servs.*, No. 19-1883V, 2022 WL 662550, at *3 (Fed. Cl. Spec. Mstr. Feb. 2, 2022) (93-day delay); *Dawson-Savard v. Sec'y of Health & Human Servs.*, No. 17-1238V, 2020 WL 4719291, at *2 (Fed. Cl. Spec. Mstr. July 14, 2020) (106-day delay); *Rafferty v. Sec'y of Health & Human Servs.*, No. 17-1906V, 2020 WL 3495956, at *2-3 (Fed. Cl. Spec. Mstr. May 21, 2020) (54-day delay).  Moreover, petitioner reasonably explains that several factors beyond her degree of pain contributed to this delay.  Specifically, petitioner averred that she thought her condition may be temporary, she was already taking time off of work to take her daughter to medical appointments during this period, and she had a high deductible insurance plan.  (Ex. 47, p. 1.)

All of this suggests that the delay in seeking treatment should not in itself imply that petitioner's pain was, in effect, bearable.  However, when petitioner did begin to seek care, she reported that her pain had worsened only gradually and rated her pain as only 2/10 while resting and 6/10 when raising her arm.  (Ex. 2, pp. 5-6.)  Petitioner provided similar pain ratings at her first physical therapy evaluation the following month.  (Ex. 3, pp. 7-8.)  By the time she completed her initial course of physical therapy in April of 2017 she was rating her pain as a 2/10 at worst, though she subsequently reported pain of 4/10 to her orthopedist.  (Ex. 6, p. 12; Ex. 5, pp. 7-8.)  Thus, in addition to initially delaying her treatment, petitioner also was not reporting severe pain to her physicians.

Neither the delay in seeking treatment nor the numerical pain ratings are dispositive; however, when considering the course of petitioner's medical history as a whole, it is the persistence rather than the severity of petitioner's pain that stands out. The severity of petitioner's shoulder pain seems to be best characterized as relatively moderate for a SIRVA.  Petitioner stresses in her briefing the failure of her multiple steroid injections and her ultimate resort to narcotic pain relief.  (ECF No. 109, pp. 14, 16; ECF No.112. pp. 5 n. 2, 6.)  However, these factors speak to the ultimate chronicity of her pain as much or more so than the severity.

A related disagreement between the parties is the significance of petitioner's range of motion.  Respondent argues that, overall, petitioner did not have substantial limitations in her range of motion.  (ECF No. 111, p. 19.)  Petitioner does not directly contradict that contention but urges that this should not obscure the fact that she continued to report ongoing pain regardless.  (ECF No. 112, p. 5.)  Here, both parties are correct.  It is clear that a reduced range of motion in the shoulder is a factor that can have its own effect on a petitioner's quality of life and pain and suffering. *See, e.g., Marino*, 2018 WL 2224736 (finding relevant that reduced range of motion interfered both with petitioner's work and her hobby as an avid tennis player); *Hooper*, 2019 WL 1561519 (finding that petitioner was entitled to future pain and suffering damages due to a 22.5% loss of use of her left arm).  In this case, however, petitioner's pain management records indicate that she is "highly functional" and "is able to modify her activities [so] that she does not have to do too much reaching or lifting." (Ex. 48, p. 2.)  Nonetheless, as discussed above, petitioner was still experiencing persistent pain.

Finally, respondent raises a question regarding the reason for petitioner's second surgery and whether her AC arthritis represents an unrelated source of pain.  (ECF No. 111, pp. 20-21.)  For example, the *Lawson* petitioner was noted to have had what was at the time an unprecedented three shoulder surgeries in the course of her treatment.  The third, surgery, however, addressed a SLAP tear and was therefore somewhat ambiguous in terms of whether it was representative of her SIRVA sequela.  Given the intermittent character of the *Lawson* petitioner's pain, the chief special master noted that "[t]his raises the question, as we get further from the vaccine administration, whether *all* of Petitioner's sequelae are related to the SIRVA, even if Petitioner continues to live in some amount of pain."  2021 WL 688560, at *6 (emphasis in original).

As illustrated by the *Lawson* decision, respondent is not wrong to suggest that a petitioner could experience shoulder symptoms unrelated to her SIRVA injury. Respondent is also not wrong to suggest that this issue could have a bearing on damages even where it did not defeat a petitioner's claim relative to entitlement.  In this particular case, however, the parties specifically litigated the question of whether petitioner's condition was explained by degenerative findings, including AC arthritis.  Petitioner's expert, Dr. Srikumaran, opined that, even if AC joint arthritis is itself a degenerative condition, petitioner's own AC joint symptoms can be explained as SIRVA sequela resulting from diffuse inflammation that originated as bursitis.  (ECF No. 87, p. 10 (citing Ex. 39, p. 8).)  He further opined that the second surgery constituted appropriate care under this circumstance.  (*Id.*)  In contrast, respondent's expert, Dr.

14

Winell, specifically disclaimed any opinion that petitioner's shoulder pain was more likely explained by her AC arthritis.[5]  (*Id*. at 17 (citing Ex. C, p. 2).)

Briefly comparing this case to the cases cited by petitioner, the *Welch*, *Lawson*, and *Elmakky* petitioners all had three surgeries, one more than this petitioner, and experienced at least moderately reduced range of motion.  *Welch*, 2021 WL 1795205, at *4 (noting petitioner had three surgeries); *Lawson*, 2021 WL 688560 at *2-3 (three surgeries including extensive debridement, extensive bursectomy, subacromial decompression, extensive debridement of the bursa and subacromial space, arthroscopic distal clavicle excision); *Elmakky*, 2021 WL 6285619 at *5-6 (three surgeries including shoulder manipulation, bursal aspiration, rotator cuff repair, debridement, acromioplasty, acromionectomy).  *Welch* and *Lawson* reported moderate pain like this petitioner; however, the *Elmakky* petitioner's pain was characterized as severe.  *Welch*, 2021 WL 1975205 at *1-2 (seeking treatment a week after vaccination and reporting pain at 3-7/10); *Lawson*, 2021 WL 688560 at *1-2 (seeking treatment six days after vaccination and reporting moderate pain, loss of range of motion, and loss of strength); *Elmakky*, 2021 WL 6285619 at *5 (reporting severe pain at initial presentation).  Like this petitioner, each had an extended period of recovery, multiple steroid injections, and multiple courses of physical therapy.  *Lawson*, 2021 WL 688560 at *2-3; *Welch*, 2021 WL 1975205 at *1-2; *Elmakky*, 2021 WL 6285619 at *5-6.

The *Schoonover*, *McDorman* and *M.W.* petitioners are more similar to this petitioner in that each had two surgeries rather than three.  All had extensive physical therapy and multiple steroid injections.  *Schoonover*, 2020 WL 5351351, at *5; *M.W.*, 2021 WL 3618177 at *1-2; *McDorman*, 2021 WL 5504698 at *2-3.  All had moderately reduced range of motion.  *Id.*  In contrast to this petitioner, the *Schoonover* petitioner's pain was characterized as severe and had a more demonstrable effect on her daily life (she suffered professionally and additionally suffered depression).  2020 WL 5351341, at *4.  Petitioner distinguishes *M.W.* based on the *M.W.* petitioner having had a gap in treatment. (ECF No. 112, pp. 8-9.)  Importantly, however, in awarding damages the chief special master concluded that, given the Covid-19 pandemic, the *M.W.* petitioner's gap in treatment was adequately explained and he concluded that the petitioner's injury had persisted throughout that period.  2021 WL 3618177, at *4.

---

[5] Specifically, Dr. Winell wrote:

> Dr. Srikumaran states that in my report I stated that "AC joint arthritis is the more likely explanation of her shoulder pain."  This is his gross error.  My report only stated that she did not have resolution of her pain after her initial surgery and required an additional surgery to address an ongoing degenerative process.  I further stated that the AC arthritis noted in the second operative report would not have been caused by the vaccine.  It is unclear how Dr. Srikumaran arose to the conclusion based on these statements that I felt the AC joint was the more likely explanation for her shoulder pain.  It was clear that petitioner had generalized shoulder pain consistent with impingement as well as AC joint pain, both of which are commonly seen together in this age group and many times addressed with one surgery.

(Ex. C, p. 2.)

15

I am mindful of prior decisions regarding damages for SIRVA, including those cited by the parties. However, I do not rely on any one prior decision to determine the amount of petitioner's damages in this case. Instead, I have reviewed previous SIRVA awards, the arguments presented by the parties, and the totality of the evidentiary record. As noted above, the primary considerations informing pain and suffering in SIRVA cases is the severity and duration of the shoulder pain. Numerous aspects of a petitioner's medical history potentially speak to these issues, including the total duration of the petitioner's pain, the total duration of petitioner's reduced range of motion, the length of time over which the petitioner actively treated the condition, the duration and outcome of physical therapy, the modalities of treatment (*e.g.* steroid injections, surgeries, etc.), the severity of MRI or surgical findings, subjective reports of pain levels, and the ultimate prognosis.

Based on the record as a whole, I conclude that $195,000.00 represents a reasonable and appropriate award for petitioner's actual (or past) pain and suffering.

### b. Projected (Future) Pain and Suffering

As noted by the chief special master in *Winkle, supra*, a much more limited number of prior cases have seen SIRVA petitioners awarded damages for projected pain and suffering. Those awards have ranged from $250 to $1,500 per year. In *Curri*, the petitioner was awarded $550 per year due to significant pain, permanently reduced range of motion, and specific challenges faced by the petitioner in her day-to-day life. *Curri v. Sec'y of Health & Human Servs.*, No. 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018). The petitioner in *Dawson-Savard* was noted to be similar to the *Curri* petitioner and was awarded $500. *Dawson-Savard*, 2020 WL 4719291, at *4. In *Binette*, the petitioner was awarded $1,000 per year because her orthopedist concluded her condition was permanent and inoperable, meaning she would continue to experience her existing levels of pain. *Binette v. Sec'y of Health & Human Servs.*, No. 16-731V, 2019 WL 1552620, at *14 (Fed. Cl. Spec. Mstr. Mar. 20, 2019). In *Hooper* and *Schoonover*, the petitioners were awarded $1,500 and $1,200 per year respectively based in significant part on partial disability that was either permanent or having a guarded prognosis. *Hooper*, 2019 WL 1561519, at *4; *Schoonover*, 2020 WL 5351341, at *5. In contrast, the *Danielson* petitioner was awarded only $250 per year in future pain and suffering based on the fact that she continued to report pain with movement subsequent to having exhausted all conservative treatment options. *Danielson v. Sec'y of Health & Human Servs.*, No. 18-1878V, 2020 WL 8271642, at *5 (Fed. Cl. Spec. Mstr. Dec. 29, 2020).

Here, given the length of time petitioner has been actively treating with a pain management specialist, her continued reliance on narcotic pain relief, and the opinion of her pain management specialist that she has a poor prognosis for a full resolution of her pain, I conclude that an award of projected pain and suffering is appropriate. Nonetheless, these same treatment records do not reflect severe sequela. For example, petitioner's August 12, 2021 pain management follow up recorded that while

petitioner has ongoing pain and some limitations in lifting, "medicine helps make it not so bad." (Ex. 53, p. 1.)  By the time petitioner began seeking pain management, her range of motion was noted to be good and she was characterized as "highly functional" and her pain described as "aching most of the time with shooting only occasionally." (Ex. 48, pp. 1-2.)  Accordingly, while petitioner is likely to continue experiencing pain and at least some limitation on her day-to-day life indefinitely, she is not experiencing ongoing sequela comparable in severity to any of the above-discussed petitioners apart from *Danielson*.

In light of all of the above, I find that $400 per year for the 34.5 year life expectancy identified by petitioner in her motion represents a reasonable and appropriate award for projected pain and suffering.

### c. Lost wages and other expenses

As explained above, petitioner has asserted that she incurred $4,847.18 in past unreimbursable expenses.  (ECF No. 109, p. 16.)  Petitioner has documented these expenses at Exhibit 55 and respondent has agreed that these expenses are compensable.  (ECF No. 111, n .1.)  Accordingly, I conclude that petitioner is entitled to an award in this amount.

Petitioner's motion also asserts a lost wages claim of $4,209.59 without specific explanation.  (ECF No. 109, p. 16.)  Instead, petitioner merely cites her filing of documents at Exhibit 56.  (*Id*.)  Exhibit 56 consists of tax returns and paystubs.  The paystubs have handwritten notations on them by petitioner indicating that they both show missed and unpaid time, as well as hours paid at a reduced rate, due to shoulder surgery.  (Ex. 56, p. 74 *et seq*.)  There is no specific explanation of how petitioner arrived at the total figure of $4,847.18.

Respondent does not dispute that the documents show petitioner to have missed time from work due to her surgical procedures (ECF No. 111, n. 16); however, respondent does dispute petitioner's calculation of the resulting lost wages.  Respondent argues that "[p]etitioner has not filed a report by an economist detailing the calculation for such damages" and petitioner's supporting documents "do not delineate petitioner's proposed calculation of lost earnings or an offset for applicable taxes."  (*Id*. at 24.)  Respondent argues that the correct amount is $3,059.11.  (*Id*.)  Petitioner did not dispute respondent's contention in her reply or otherwise further substantiate her lost wages claim.  In fact, petitioner did not address her lost wages claim at all in her reply.  (ECF No. 112.)

In light of the above, I conclude that petitioner is entitled to an award for lost wages in the amount of $3,059.11.  To the extent she contends her lost wages were in a higher amount, she has not adequately explained that position.

17

## VI. Conclusion

The parties shall file a joint status report by no later than <u>**Wednesday, August 24, 2022**</u>, converting the award of future pain and suffering to its net present value.  If the parties are unable to agree on the amount of the net present value of the future award, they shall instead file separate supplemental briefs addressing the issue, including a final calculation of the net present value, sufficient information to understand the basis for the calculation, and the legal authority supporting the preferred approach.  Once the issue of net present value for the future award is resolved, a damages decision will issue.

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u>
Daniel T. Horner
Special Master